**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **NOKIA TECHNOLOGIES OY,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**AYLO HOLDINGS S.À R.L., AYLO GROUP LTD., AYLO FREESITES, LTD., AYLO PREMIUM, LTD., 9219-1568 QUEBEC INC.,**<br><br>**Defendants.** | **Civil Action No. 2:26-cv-882**<br><br>**JURY TRIAL DEMANDED** |

## ORIGINAL COMPLAINT

Plaintiff Nokia Technologies Oy ("Nokia" or "Plaintiff") files this Original Complaint against Aylo Holdings S.à r.l. f/k/a MindGeek S.à r.l., Aylo Group Ltd. f/k/a Aylo CY Holdings Ltd., Aylo Freesites, Ltd. f/k/a MG Freesites, Ltd., Aylo Premium, Ltd. f/k/a MG Premium, Ltd., and 9219-1568 Quebec Inc. (collectively, "Aylo" or "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1. Nokia is a world leader in video coding innovation and has spent decades researching and developing techniques to better compress video for more efficient storage, transmission, and playback. Nokia's patented inventions allow video to be efficiently and reliably transmitted and received over communications networks, such as Wi-Fi or cellular networks, with high quality and dramatically lower bandwidth requirements, and minimize the amount of data it takes to receive and store these videos. The Asserted Patents (defined below) include claims covering techniques for encoding video into H.264-compliant formats.

2. Encoding video generally refers to compressing or reducing the size of raw video files so that they are suitable for storage and transmission over different media (e.g., over the

internet or cellular telecommunications networks) and are also suitable for playback on devices that may have different capabilities (e.g., a mobile device or a computer).

3. By contrast, decoding is the process of de-compressing a video for playback or other purposes. The H.264 Advanced Video Coding Standard ("H.264 Standard") promulgated by the International Telecommunication Union ("ITU") is one of the most widely used video decoding standards in the world. However, as the H.264 Standard is a decoding standard, Nokia's encoding claims are not essential to the H.264 Standard.

4. Aylo has used and uses Nokia's video coding technology without a license to provide videos to many millions of users. The "Accused Services" are backend processes, including encoding, that infringe one or more method claims in Nokia's Asserted Patents (defined below), for example for the purpose of providing videos to users.

5. Aylo has encoded videos into H.264-compliant formats in the United States.

6. Aylo encodes videos into H.264-compliant formats in the United States.

7. Aylo has benefited and currently benefits from Nokia's innovations, which among other things enable Aylo's Accused Services to encode and deliver high-quality video more efficiently and effectively. Aylo even boasts on the front page of its website that it encodes "67,000 hours of video [] per day," highlighting the importance of Nokia's patented technology to Aylo's ad-supported and subscription businesses:[1]

[1] https://www.aylo.com/ (red box added).




8. Though other companies have recognized and validated the strength of Nokia's video patent portfolio by taking licenses to Nokia's portfolio, Aylo is using Nokia's patented technology without a license. Nokia brings this lawsuit to obtain compensation for Aylo's unlicensed use of Nokia's patented technology.

## PARTIES

9. Plaintiff Nokia Technologies Oy is a foreign corporation organized under the laws of Finland, with its principal place of business at Karakaari 7, FIN-02610, Espoo, Finland. Plaintiff is a wholly owned subsidiary of Nokia Corporation ("Nokia Corp.") and the sole owner by assignment of all right, title, and interest in U.S. Patent Nos. 7,532,808; 6,950,469; 8,175,148; 8,050,321; 7,289,674; 6,968,005; and 8,107,744 (the "Asserted Patents").

10. On information and belief, Defendant Aylo Holdings S.à r.l. is a foreign entity organized and existing under the laws of Luxembourg and conducting business in the United States, including in Texas and this District, through several subsidiary companies. Aylo Holdings S.à r.l. owns, either directly or indirectly, several adult entertainment brands, including Pornhub, Pornhub Premium, YouPorn, YouPorn Premium, RedTube, RedTube Premium, Tube8, Thumbzilla, ModelHub, Xtube, Brazzers, MOFOS, Babes.com, Twistys, Men.com, RealityKings,

Digital Playground, SpiceVids, and FakeTaxi, among others.[2] Though Defendant Aylo Holdings S.à r.l. is the "ultimate parent company" of the other Defendants, it is a holding company with no employees or operations of its own.[3]

11. On information and belief, in August 2023, MindGeek S.à r.l. rebranded as Defendant Aylo Holdings S.à r.l.[4]

12. On information and belief, Defendant Aylo Group Ltd. is a company incorporated in Cyprus, having its head office in Cyprus. Aylo Group is the direct corporate parent for Aylo Freesites and Aylo Premium.[5]

13. On information and belief, Aylo Group Ltd. was formerly known as Aylo CY Holdings. In August 2023, MG CY Holdings Ltd rebranded to Aylo CY Holdings.

14. On information and belief, Defendant Aylo Freesites is a company incorporated in the Republic of Cyprus, having its head office at 195-197 Old Nicosia-Limassol Road, Block 1 Dali Industrial Zone, Cyprus, and conducting business in the United States, including in Texas and this District.[6] Defendant Aylo Freesites "is responsible for operating tubesites, including Pornhub," as well as associated websites like "Pornhub Premium" and "the ModelHub program and Content Partner Program."[7]

---

[2] https://www.aylo.com/brands/; *WellcomeMat v. Aylo et al.*, 2:23-cv-00483, Dkt. No. 174 ("Aylo *WellcomeMat* Answer"), ¶ 11 (E.D. Tex., Oct. 30, 2024).

[3] *Fleites v. MindGeek S.A.R.L., et al.*, No. 2:21-cv-04920 (C.D. Cal., May 23, 2022), Dkt. No. 139-3 ("Andreou Decl."), ¶¶ 13-14; Aylo *WellcomeMat* Answer, ¶ 20.

[4] Aylo *WellcomeMat* Answer, ¶ 17; https://www.aylo.com/newsroom/mindgeek-becomes-aylo/.

[5] *Aylo Freesites Ltd. v. Utah Div. of Consumer Prot.*, 2:26-cv-00340, Dkt. No. 3-1, ¶ 6 (D. Utah, April 22, 2026).

[6] Andreou Decl., ¶ 16; Aylo *WellcomeMat* Answer, ¶ 13.

[7] Andreou Decl., ¶ 17; Aylo *WellcomeMat* Answer, ¶ 13.

15. On information and belief, in August 2023, MG Freesites Ltd rebranded as Defendant Aylo Freesites.[8]

16. On information and belief, Defendant Aylo Premium is a company incorporated in the Republic of Cyprus, having its head office at 195-197 Old Nicosia-Limassol Road, Block 1 Dali Industrial Zone, Cyprus, and conducting business in the United States, including in Texas and this District.[9] Defendant Aylo Premium is responsible for the operation of several popular adult entertainment websites, including Brazzers, MOFOS, Babes.com, Twistys, Men.com, RealityKings, DigitalPlayground, SpiceVids, and FakeTaxi.[10]

17. On information and belief, in August 2023, MG Premium Ltd rebranded as Defendant Aylo Premium.[11]

18. On information and belief, Defendant 9219-1568 Quebec Inc. is a company incorporated in Canada, having its head office at 6975 Boulevard Décarie, Suite 601, Montreal, Quebec H3W 0B6.[12] Defendant 9219-1568 Quebec Inc. provides management services and technical programming to other Aylo companies.

19. The Defendants all operate under the Aylo brand, share offices, and have overlapping boards of directors, which ensures that common members maintain control over Defendants.[13] Thus, Defendant Aylo Group, Defendant Aylo Freesites, Defendant Aylo Premium, and Defendant 9219-1568 Quebec, are agents and alter egos of Defendant Aylo Holdings S.à r.l.

---

[8] Aylo *WellcomeMat* Answer, ¶ 17.

[9] Andreou Decl., ¶ 23; Aylo *WellcomeMat* Answer, ¶ 15.

[10] Aylo *WellcomeMat* Answer, ¶ 15.

[11] Aylo *WellcomeMat* Answer, ¶ 17.

[12] *Jane Doe v. Aylo Global Entm't*, 2:23-cv-07488, Dkt. No. 149 ¶ 77 (C.D. Cal., Oct. 30, 2025).

[13] Andreou Decl., ¶¶ 15, 19, 26.

**JURISDICTION AND VENUE**

20. This Court has exclusive subject matter jurisdiction over the patent infringement claims in this case under 28 U.S.C. §§ 1331 and 1338 and on all other claims under 28 U.S.C. § 1376.

21. This Court has personal jurisdiction over Defendants because they have, directly and/or through agents and/or intermediaries, committed acts and continue to commit acts of patent infringement, including within Texas, giving rise to this action and/or have established minimum contacts with Texas such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

22. Defendants, directly and/or indirectly through agents and intermediaries, have committed and continue to commit acts of infringement, including, on information and belief, in Texas and this District. Defendants, among other things, use the infringing Accused Services to place one or more encoded video bitstreams into the stream of commerce over the internet with the knowledge and/or understanding that such Accused Services are being utilized for the purpose of offering services and videos in Texas. In fact, Defendants and their websites specifically targeted Texas and this District by utilizing Accused Services for the purpose of offering services and videos as shown by Defendants' decision to track metrics like the top search terms of Texan customers and the time spent on Defendants' websites.[14]

23. On information and belief, Defendants regularly conduct and have conducted business in Texas, including in this District, and purposefully avail themselves of the privileges of conducting business in Texas and this District. In particular, on information and belief, Defendants,

---

[14] *E.g.*, https://www.pornhub.com/insights/2022-year-in-review.

and/or their agents and/or intermediaries, make, use, import, offer for sale, sell, and/or advertise their products and affiliated services in Texas and this District, sufficient to give rise to jurisdiction.

24. On information and belief, Defendants purposefully derive and have derived substantial revenue from the Accused Services within Texas, including within this District, and/or expect or should reasonably expect their actions to have consequences in Texas. On information and belief, Defendants have derived and continue to derive revenue from the Accused Services within Texas through advertisement revenues generated by Texas residents and subscription fees paid by Texas residents, including through websites like Pornhub, Pornhub Premium, YouPorn, YouPorn Premium, RedTube, RedTube Premium, Tube8, Thumbzilla, ModelHub, Xtube, Brazzers, MOFOS, Babes.com, Twistys, Men.com, RealityKings, Digital Playground, SpiceVids, and FakeTaxi among others.

25. On information and belief, through their websites' "Content Partner Program" and "Model Program," Defendants partner with Texas residents to upload videos to Defendants' websites. These partnerships allow Defendants to generate additional revenue related to the Accused Services within Texas.

26. Defendants have previously invoked the jurisdiction of courts in the State of Texas and acknowledged their extensive contacts with Texas, including by alleging that they hold a "protected property right in the goodwill of Texan viewers" that Texas courts were required to protect on Defendants' behalf.[15] Defendants have also previously participated in patent infringement litigation in Texas and this District and affirmatively asserted claims in the same.[16]

27. Defendants' infringing activity has led to foreseeable harm and injury to Nokia.

---

[15] *Free Speech Coalition, Inc., et al. v. Colmenero, et al.*, No. 1:23-cv-00917, Dkt. No. 1, ¶ 5, (W.D. Tex. Aug. 4, 2023).

[16] *See generally* Aylo *WellcomeMat* Answer.

28. Defendants do not reside in the United States, and thus venue is appropriate in this District under 28 U.S.C. § 1391(c)(3).

## I. NOKIA'S INVESTMENT IN VIDEO CODING TECHNOLOGY AND RESULTING PATENT CLAIMS

29. Nokia has consistently been one of the major contributors to wireless communication, audio, and video standards and technologies that enable many features that are commonplace and expected of today's consumer electronics, video streaming, and social media services.

30. Nokia Corp. (Plaintiff's parent company), together with its wholly owned subsidiaries, has cumulatively invested billions of dollars in research and development relating to mobile communications and video coding technologies and, because of this commitment, currently owns more than 20,000 patent families worldwide. These include many patents with encoding patent claims that are implemented due to the efficiencies they bring to non-standardized encoding processes.

31. Over the last few decades, internet traffic has evolved from simple, text-based interfaces to a plethora of media, including video. As technology has evolved, the importance and use of video have skyrocketed. Video coding technologies are crucial to the development and evolution of modern communication, particularly as video traffic has become an increasingly outsized share of total consumer Internet traffic. Over the past several years, video has become the main form of internet traffic, coinciding with, for example, the rise in popularity of internet and social media apps and streaming services. In 2022, for example, video was estimated to be 82% of global consumer internet traffic. Aylo's websites are predominantly video-based, and Aylo has benefitted greatly from video coding technologies, including inventions covered by method claims of the Asserted Patents.

## II. NOKIA'S ATTEMPTED NEGOTIATIONS WITH AYLO

32. Nokia first informed Aylo of Nokia's extensive portfolio of patents relevant to multimedia technologies in a letter dated August 21, 2025. In this letter, Nokia requested that the parties discuss Aylo taking a license to Nokia's multimedia patents. Aylo's Chief Legal Officer, Anthony Penhale, signed for this letter to confirm receipt.

33. Aylo did not respond to Nokia's August 21, 2025, letter.

34. On December 3, 2025, Nokia sent a second letter to Aylo, again requesting that the parties discuss a license to Nokia's multimedia patents.

35. Aylo did not respond to Nokia's December 3, 2025, letter.

36. Nokia sent Aylo a third letter on March 27, 2026. Nokia stated that Aylo and its sub-brands used Nokia's patented technology without a license and requested a meeting between Nokia and Aylo. Aylo's Chief Legal Officer, Anthony Penhale, signed for this letter to confirm receipt.

37. Aylo did not respond to Nokia's March 27, 2026, letter.

38. Despite Nokia's good faith efforts to negotiate with Aylo, Nokia has been unable to engage Aylo in discussions. Aylo profited and has continued to profit from infringing Nokia's patents but has paid no royalties.

39. Aylo's continued and past unauthorized use of Nokia's patents has prompted Nokia to seek the relief sought by this Complaint.

## III. THE ITU COMMON PATENT POLICY

### A. The ITU and the H.264 Standardization Process

40. The ITU and the International Standards Organization ("ISO") jointly published the H.264 Standard referred to as "H.264," "MPEG-4 part 10," or "Advanced Video Coding." The H.264 Standard development process was initiated by the Video Coding Experts Group ("VCEG")

and finalized by the Joint Video Team ("JVT"), which was a collaborative effort between the ITU and the Moving Picture Experts Group ("MPEG").

41. The ITU was formed in 1865 at the International Telegraph Convention, and, in 1947, it became a specialized agency of the United Nations, responsible for issues that concern information and communication technologies. The ITU handles a variety of matters and thus is organized into various sectors. One of the sectors is Telecommunication Standardization or "ITU-T." The mission of ITU-T is to ensure efficient and timely production of standards related to the field of telecommunications. The standards developed by ITU-T are referred to as "Recommendations."

42. Within ITU-T, members come together and propose technological solutions for inclusion in the draft Recommendations. The goal is to draft Recommendations that incorporate the best available technology to ensure that the standards are of a high quality. The H.264 Standard described above is detailed in the H.264 Recommendation.

43. The contributions that are ultimately included in a Recommendation are often covered by one or more patent claims, and thus the ITU developed the Common Patent Policy to assist with usage of patented technologies in Recommendations.

44. The ITU published Guidelines for Implementation of the Common Patent Policy ("the Guidelines"). The Guidelines explain that the Common Patent Policy "was drafted in its operative part as a checklist, covering the three different cases which may arise if a Recommendation | Deliverable requires licenses for Patents to be practiced or implemented, fully or partly." *"Guidelines for Implementation of the Common Patent Policy for ITU-T/ITU-R/IISO/IEC,"* ITU, Rev. 4 (Dec. 16, 2022) https://www.itu.int/itudoc/itu-t/patents/policy/guide.pdf.

45. The Common Patent Policy states:

> 2. If a Recommendation | Deliverable is developed and such information as referred to in paragraph 1 has been disclosed, three different situations may arise:
>
> 2.1 The patent holder is willing to negotiate licences free of charge with other parties on a non-discriminatory basis on reasonable terms and conditions. Such negotiations are left to the parties concerned and are performed outside ITU-T/ITU-R/ISO/IEC.
>
> 2.2 The patent holder is willing to negotiate licences with other parties on a non-discriminatory basis on reasonable terms and conditions. Such negotiations are left to the parties concerned and are performed outside ITU-T/ITU-R/ISO/IEC.
>
> 2.3 The patent holder is not willing to comply with the provisions of either paragraph 2.1 or paragraph 2.2; in such case, the Recommendation | Deliverable shall not include provisions depending on the patent.
>
> 3. Whatever case applies (2.1, 2.2 or 2.3), the patent holder has to provide a written statement to be filed at ITU-TSB, ITU-BR or the offices of the CEOs of ISO or IEC, respectively, using the appropriate "Patent Statement and Licensing Declaration" form. This statement must not include additional provisions, conditions, or any other exclusion clauses in excess of what is provided for each case in the corresponding boxes of the form.

*"Common Patent Policy for ITU-TIITU-RIISOIIEC,"* ITU (2022), https://www.itu.int/en/ITU-T/ipr/Pages/policy.aspx.

46. The Guidelines define the term "Patent" to be "those claims contained in and identified by patents, utility models and other similar statutory rights based on inventions (including applications for any of these) solely to the extent that any such claims are essential to the implementation of a Recommendation | Deliverable. Essential patents are patents that would be required to implement a specific Recommendation | Deliverable." *"Guidelines for Implementation of the Common Patent Policy for ITU-T/ITU-R/ISO/IEC,"* ITU, Rev. 4 (Dec. 16, 2022) https://www.itu.int/itudoc/itu-t/patents/policy/guide.pdf. The definition of "Patent" provided by the Guidelines is mirrored in the Patent Statement and Licensing Declaration Form that is completed by patent holders who may have patent claims essential to the H.264 Standard.

The Patent Statement and Licensing Declaration Form states that identifying specific patents on the form is optional but not required. The ITU thus deems "essential" only patent claims that are essential or necessary for implementation of a specific Recommendation.

47. The H.264 Recommendation specifies the implementation of decoders and specifically defines the "decoding process" as "[t]he process specified in this Recommendation | International Standard that reads a *bitstream* and derives *decoded pictures* from it." Ex. 1 at 6 [Recommendation ITU-T H.264] (italics original). It does not, however, specify the implementation of encoders. The H.264 Recommendation defines "encoding process" as "[a] process, *not specified in this Recommendation* | International Standard, that produces a *bitstream* conforming to this Recommendation | International Standard." *Id*. (italics original).

48. Accordingly, as tribunals have recognized, encoding processes like the ones described in Nokia's encoding claims are not "essential" to the H.264 Standard and are thus not encumbered or covered by the ITU's Common Patent Policy.

**B. Nokia's Compliance with the ITU Common Patent Policy**

49. Nokia protects its investments in research and development with intellectual property. Nokia has voluntarily contributed its research and development innovations related to decoding to the standard-setting process at the ITU through technical contributions in standardization meetings. Industry members attending the standardization meetings chose to adopt Nokia's technology because of its benefits and merit. As a result, Nokia has many decoding patent claims that are essential to the H.264 Standard.

50. Nokia has committed that it is prepared to grant licenses for decoding according to the H.264 Standard to any patent claims essential to the H.264 Standard on reasonable and non-discriminatory ("RAND") terms and conditions as set forth in the ITU Common Patent Policy.

51. Consistent with the ITU Common Patent Policy, Nokia timely notified standard setting participants that Nokia may obtain patents on its decoding-related contributions, including by submitting Patent Statement and Licensing Declarations to the ITU in which Nokia declares in good faith that it is prepared to grant licenses to the essential claims of the relevant patents on RAND terms and conditions.

52. As the encoding processes covered in Nokia's patents are not "essential" to the H.264 Standard, they are not covered by Nokia's declarations to the ITU or otherwise RAND encumbered.

## IV. NOKIA ASSERTED PATENTS

53. Nokia complied with any applicable marking requirements under 35 U.S.C. § 287 as to the Asserted Patents at least because the asserted claims of the Asserted Patents are all method claims that do not require marking and/or there is nothing to mark.

### A. U.S. Patent No. 7,532,808

54. Nokia owns by assignment the entire right, title, and interest in and to U.S. Patent No. 7,532,808 (the "'808 Patent"). The '808 Patent, entitled "Method for Coding Motion in a Video Sequence," issued on May 12, 2009, to inventor Jani Lainema. The '808 Patent issued from U.S. Patent Application No. 10/390,549, filed on March 14, 2003, and claims priority to U.S. Provisional Application No. 60/365,072, filed on March 15, 2002. A true and correct copy of the '808 Patent is attached as Exhibit 2 and incorporated by reference herein.

55. The '808 Patent is not directed to an abstract idea or any patent-ineligible concept. Instead, the '808 Patent is directed to novel and unconventional improvements to motion-compensated prediction in the field of digital video coding. The '808 Patent provides improvements over prior motion compensated prediction and video compression techniques that

result in substantial benefits to motion prediction, video compression, video quality, and video playback.

56. A digital video sequence is a sequence of still images with "the illusion of motion being created by displaying consecutive images of the sequence one after the other at a relatively fast rate." '808 Patent at 1:15-19. These still images are referred to as frames. "Each frame of an uncompressed digital video sequence comprises an array of image pixels." *Id*. at 1:32-33. Frames in commonly used video formats may have millions of pixels each.

57. The '808 Patent describes that video frames in a given digital video sequence may contain various forms of redundancy. *Id.* at 2:36-46. "Temporal redundancy" refers to the fact that "objects appearing in one frame of a sequence are likely to appear in subsequent frames." *Id*.

58. As the '808 Patent explains, "motion-compensated prediction" can take advantage of temporal redundancy to "predict" the image content of some frames from "one or more other frames in the sequence, known as 'reference frames.'" *Id.* at 3:15-18. Predictions can be achieved by tracking the motion of objects or regions of an image between a given frame and one or more reference frames. *Id.* at 3:18-23.

59. Prior to the '808 Patent, some motion-compensated prediction techniques involved assigning "coding modes" to "macroblocks" (a region of 16x16 image pixels in the original image). *See id*. at 1:64-2:6. One such coding mode was referred to as "SKIP" mode. SKIP mode was assigned to macroblocks that could be copied from a reference frame without using motion-compensated prediction. '808 Patent at 10:64-67. SKIP mode prior to the '808 Patent provided benefits in certain scenarios without motion from frame to frame.

60. As explained in the '808 Patent, "it is necessary for a corresponding video decoder to be aware of that coding mode in order for it to correctly decode the received information relating

to the macroblock in question." '808 Patent at 11:20-24. "Therefore, an indication of the coding mode assigned to each macroblock is provided in the video bit-stream." '808 Patent at 11:24-27. The indication can be transmitted using a variable length codeword, where "the shortest codeword is used to represent the coding mode that is statistically most likely to occur." '808 Patent at 11:27-32. At the time of the '808 Patent (during development of what would become the H.264 Standard), SKIP mode was assumed to be the most frequently occurring mode.

61. However, SKIP mode could not effectively address problems with certain types of redundancy within video sequences—for example, global and regional motion, which can occur when a video sequence includes panning or zooming. *Id*. at 12:41-47. For example, redundancies may occur in a video sequence when footage is captured by a video camera moving horizontally or when translational motion occurs, such as when a volleyball moves overhead across a court. Prior motion-compensated prediction techniques could not efficiently or effectively handle these scenarios. For example, in the prior H.263+ video coding standard, this global motion scenario could have been addressed by using a highly complex global motion compensation technique that required the decoder to rely on additional information describing the overall motion of a scene in a video sequence. *Id*. at 12:48-13:30. This prior solution was computationally intensive and less efficient compared to the techniques described in the '808 Patent. *Id*.

62. The '808 Patent overcame these technical challenges in the prior systems by inventing an improved skip coding mode. The '808 Patent's improved skip coding mode can address certain scenarios with or without motion without the need for additional motion data by using motion information already present for surrounding macroblocks or sub-blocks. *See* '808 Patent at 14:48-64. For example, the '808 Patent teaches that the skip coding mode is associated with either a zero (non-active) motion vector or a non-zero (active) motion vector, where the

decision is made by analyzing the motion of other macroblocks or sub-blocks in a region surrounding the macroblock to be coded. *Id.* at 14:23-32. Therefore, for example, "SKIP mode macroblocks can adapt to the motion in the region surrounding them, enabling global or regional motion to [be] taken account of in an efficient manner." *Id*. at 14:48-51.

63. An encoder can assign a skip coding mode to a given macroblock and include such an indication in the bitstream. For a skip coded macroblock, an encoder needs only to encode an indication of the skip coding mode and no further motion vector information. The encoder can then use the skip coding mode to form a prediction for use in further encoding of a video. These unconventional solutions allow an encoder to, for example, reliably and efficiently encode video sequences with a drastically reduced amount of information. Because the '808 Patent inventions use the surrounding macroblocks or sub-blocks to determine how the skip coding mode will operate for a given image segment, there is no need for the video encoder to use additional information to encode certain types of motion (or no motion). *Id*. at 14:52-64.

64. The '808 Patent therefore provides specific technological improvements to the functionality and capabilities of video coding technology that, for example, "not only provides an improvement in coding efficiency in the presence of global motion . . . but also enables regional motion to be represented in an efficient manner." *Id*. at 14:14-22.

65. Nokia complied with any applicable marking requirements under 35 U.S.C. § 287 as to the '808 Patent at least because the asserted claims of the '808 Patent are all method claims that do not require marking and/or there is nothing to mark.

66. Nokia previously asserted the '808 Patent in *Nokia Technologies Oy v. Warner Bros. Entertainment Inc. et al.*, No. 1:25-cv-01337 (D. Del., Nov. 1, 2025); *Nokia Technologies Oy v. Paramount Skydance Corp. et al.*, No. 1:25-cv-01054 (D. Del., Aug 21, 2025); *Nokia*

*Technologies Oy v. ASUSTeK Computer Inc. et al.*, No. 2:25-cv-03053 (CD Cal., Apr. 7, 2025); *Nokia Technologies Oy v. Acer Inc. et al.*, No. 1:25-cv-00523 (WD Tex., Apr. 7, 2025); *Nokia Technologies Oy v. Hisense Company Ltd. et al.*, No. 1:25-cv-01871 (ND Ga., Apr. 7, 2025); *In the Matter of Certain Electronic Devices, Including Computers, Tablet Computers, and Components and Modules Thereof*, Inv. No. 337-TA-1208 (filed Jul. 2, 2020); and *In the Matter of Certain Video Capable Electronic Devices, Including Computers, Streaming Devices, Televisions, Cameras, and Components and Modules Thereof*, Inv. No. 337-TA-1379 (filed Oct. 31, 2023).

**B. U.S. Patent No. 6,950,469**

67. Nokia owns by assignment the entire right, title, and interest in and to U.S. Patent No. 6,950,469 ("the '469 Patent"). The '469 Patent, entitled "Method for Sub-Pixel Value Interpolation," issued on September 27, 2005, to inventors Marta Karczewicz and Antti Olli Hallapuro. The '469 Patent issued from U.S. Patent Application No. 09/954,608, filed on September 17, 2001. A true and correct copy of the '469 Patent is attached hereto as Exhibit 3 and incorporated by reference herein.

68. The '469 Patent is not directed to an abstract idea or any patent-ineligible concept. Instead, the '469 Patent is directed to novel and unconventional improvements to motion-compensated prediction in the field of digital video coding. The '469 Patent provides improvements over prior motion compensated prediction and video compression techniques that result in substantial benefits to motion prediction, video compression, video quality, and video playback.

69. A digital video sequence is a sequence of still images with "the illusion of motion being created by displaying consecutive images of the sequence one after the other at a relatively fast frame rate." '469 Patent at 1:10-15. Consecutive images (or frames) often tend to be only

slightly different from one another because, for example, the background is stationary or only changes slowly. *Id.* at 1:18-25. Thus, there is often a "considerable amount of redundant information" between consecutive images. *Id.* at 1:15-18. 74. The '469 Patent describes one form of redundancy as "temporal redundancy," in which "the content of some (often many) frames in a video sequence is 'predicted' from other frames in the sequence by tracing the motion of objects or regions of an image between frames." '469 Patent at 2:61-65. A "prediction frame" is created by moving prediction pixels from a reference frame according to motion information, which describes the relationship between pixels in the current frame and their corresponding prediction pixels in the reference frame. *Id.* at 3:53-58. The difference between the current frame being coded and the predicted frame is referred to as the prediction error frame. *Id.* at 3:49-64.

70. A video encoder can therefore represent a current frame in a more compact way by representing the frame in terms of the motion information required to form its prediction frame and the prediction error frame. *Id.* at 3:64-4:3. Thus, the "operating principle of video coders using motion compensation is to minimize the amount of information in a prediction error frame." *Id.* at 3:38-42.

71. However, as the '469 Patent explains, when using motion prediction, full pixel resolution is generally not sufficiently accurate to model real life motion, which has arbitrary precision. *Id.* at 6:24-35. Inaccurate prediction, in turn, increases the prediction error that must be transmitted. *See id.* at 6:35-38. To address this problem, some video coding systems used motion vectors with sub-pixel resolution, enabling more accurate modeling of real-life motion. *Id.* at 6:35-41. Allowing motion vectors to have sub-pixel resolution adds to the complexity and burden of the encoding and decoding operations that must be performed, in part because the sub-pixel values must be interpolated from full resolution pixels. *Id.* at 6:35-45, 7:23-26.

72. One problem with sub-pixel value interpolation is maintaining prediction accuracy while also limiting computational complexity and memory usage. For example, prior to the '469 Patent, conventional sub-pixel value interpolation methods used predetermined sets of particular nearby pixels and sub-pixels to interpolate other sub-pixel values, without providing any choice or flexibility and without sufficiently balancing interpolation accuracy and computational complexity. *Id.* at 11:15-21. These methods therefore required the unnecessary interpolation and storage of sub-pixel values that were needed only to interpolate other sub-pixels. *Id.* at 11:14-32. This increased computational complexity and memory requirements, as well as reduced the precision of the interpolated sub-pixel values (due to truncation when storing sub-pixel values). *Id.* Other methods reduced unnecessary dependencies in the interpolation of certain sub-pixels, but those methods retained numerical precision which required high precision arithmetic and high memory requirements. *Id.* at 13:20-29.

73. The '469 Patent overcame these technical challenges in the prior systems by inventing a method of sub-pixel value interpolation that improves performance with respect to both computational complexity and memory requirements while maintaining prediction accuracy. The '469 Patent employs the unconventional solution of providing flexibility and a choice of which pixels and sub-pixels to use in the interpolation of other sub-pixels. '469 Patent at 38:47-51. For example, the '469 Patent is superior to prior art methods in that it does not require any ¼ resolution sub-pixels to depend on previously interpolated ¼ resolution sub-pixels. *Id.* at 37:36-41. According to the '469 Patent, ¼ resolution sub-pixels that have ¼ resolution in both the horizontal and vertical directions are interpolated by a diagonally located pixel and sub-pixel or two diagonally located sub-pixels. *Id.* at 13:66-14:9. This not only reduces the number of calculations required as compared to conventional technology but also increases the precision by eliminating

truncation and clipping that occurs in the intermediate interpolation steps. *Id.* at 37:41-53. Similarly, the ’469 Patent provides the unconventional flexibility of a choice for the interpolation of the ½ resolution sub-pixels. *Id.* at 38:35-39. This also results in the minimization of operations required to perform sub-pixel interpolation. *Id.* at 38:39-43.

74. As another example, the ’469 Patent is superior to prior art methods in that it does not require high precision arithmetic to be used in the calculation of all sub-pixels. *Id.* at 37:66-38:5. The selective use of lower precision arithmetic decreases the computational complexity and increases the speed at which the calculations can be performed. *Id.* at 38:5-22.

75. The ’469 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that results in increased efficiency and reduced computational complexity and memory requirements.

76. Conventional technology prior to the ’469 Patent was not capable of providing any flexibility or choice of dependencies on pixels and sub-pixels used in sub-pixel interpolation. Conventional technology prior to the ’469 Patent also could not avoid unnecessary interpolation and storage of sub-pixel values that were needed only to interpolate other sub-pixels.

77. The ’469 Patent recognizes and solves these specific technological problems with the conventional technology at the time. The ’469 Patent’s ability to use a choice of a first weighted sum of values for sub-pixels residing at $\frac{1}{2}^{N-1}$ unit horizontal and unit vertical locations and a second weighted sum of values for sub-pixels residing at unit horizontal and $\frac{1}{2}^{N-1}$ unit vertical locations and ability to take a weighted average of the value of a first sub-pixel or pixel situated at a $\frac{1}{2}^{N-m}$ unit horizontal and $\frac{1}{2}^{N-n}$ unit vertical location and the value of a second subpixel or pixel located at a $\frac{1}{2}^{N-p}$ unit horizontal and $\frac{1}{2}^{N-q}$ unit vertical location, variables m, n, p and q taking integer values in the range 1 to N such that the first and second sub-pixels or pixels are located

diagonally with respect to the sub-pixel at $½^N$ unit horizontal and $½^N$ vertical location was a significant advancement over existing technology.

78. The novel solution of the '469 Patent, including the flexibility of a choice of which pixels and sub-pixels to use in the interpolation of other sub-pixels, was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. Furthermore, the combination of elements, including using a choice of a first weighted sum of values for sub-pixels residing at $½^{N-1}$ unit horizontal and unit vertical locations and a second weighted sum of values for subpixels residing at unit horizontal and $½^{N-1}$ unit vertical locations and taking a weighted average of the value of a first sub-pixel or pixel situated at a $½^{N-m}$ unit horizontal and $½^{N-n}$ unit vertical location and the value of a second sub-pixel or pixel located at a $½^{N-p}$ unit horizontal and $½^{N-q}$ unit vertical location, variables m, n, p and q taking integer values in the range 1 to N such that the first and second sub-pixels or pixels are located diagonally with respect to the sub-pixel at $½^N$ unit horizontal and $½^N$ vertical location, was not well-understood, routine, or conventional.

79. Nokia complied with any applicable marking requirements under 35 U.S.C. § 287 as to the '469 Patent at least because the asserted claims of the '469 Patent are all method claims that do not require marking and/or there is nothing to mark.

80. Nokia previously asserted the '469 Patent in *Nokia Technologies Oy v. Warner Bros. Entertainment Inc. et al.*, No. 1:25-cv-01337 (D. Del., Nov. 1, 2025); *Nokia Technologies Oy v. Paramount Skydance Corp. et al.*, No. 1:25-cv-01054 (D. Del., Aug 21, 2025); *Nokia Technologies Oy et al v. Apple Inc*, No. 2:16-cv-01440 (ED Tex., Dec. 21, 2016); *Nokia Technologies Oy et al v. Lenovo Group Ltd*, No. 5:19-cv-00427 (E.D.N.C., Dec. 21, 2016); *In the*

*Matter of Certain Electronic Devices, Including Computers, Tablet Computers, and Components and Modules Thereof*, Inv. No. 337-TA-1208 (filed Jul. 2, 2020).

**C. U.S. Patent No. 8,175,148**

81. Nokia owns by assignment all rights, title, and interest in and to U.S. Patent No. 8,175,148 ("the '148 Patent"). The '148 Patent, entitled "Method and Device for Indicating Quantizer Parameters in a Video Coding System," issued on May 8, 2012, to inventor Jani Lainema. The '148 Patent issued from U.S. Application No. 11/881,367, filed on July 26, 2007, which is a division of U.S. Application No. 10/421,629, filed on April 23, 2003, now U.S. Patent No. 7,263,125, which claims priority to Provisional Application Number 60/374,667, filed on April 23, 2002. A true and correct copy of the '148 Patent is attached hereto as Exhibit 4 and incorporated by reference herein.

82. The '148 Patent is not directed to an abstract idea or any patent-ineligible concept. Instead, the '148 Patent is directed to novel and unconventional improvements to providing quantization parameter values used in motion-compensated prediction in the field of digital video coding. The '148 Patent provides improvements over prior motion compensated prediction and video compression techniques that result in substantial benefits to motion prediction, video compression, video quality, and video playback.

83. Digital video is comprised of "still images, the illusion of motion being created by displaying the images one after the other" at a relatively fast rate. '148 Patent at 1:20-24. The term "temporal redundancy" refers to the fact that objects appearing in one image or frame of a video are likely to appear in subsequent frames. *Id*. at 2:55-59. A technique called "motion-compensated prediction" takes advantage of temporal redundancy and predicts a current frame from a previous ("reference") frame "by tracking the motion of objects or regions of an image between a frame to be coded (compressed) and the reference frame(s) using 'motion vectors'." *Id*. at 3:13-23. As the

’148 Patent explains, “[m]otion-compensated prediction alone rarely provides a sufficiently precise representation of the image content of a video frame and therefore it is typically necessary to provide a so-called ‘prediction error’ (PE) frame” with each temporally coded frame.” *Id.* at 3:29-33. The “prediction error frame comprises values that represent the difference between pixel values in the frame to be coded and corresponding reconstructed pixel values formed on the basis of a predicted version of the frame in question.” *Id*. at 3:36-40.

84. As described in the ’148 Patent, the prediction error values undergo transform coding and quantization in order to reduce the number of bits to be coded. *Id*. at 6:10-18, 4:39-50. However, “in order to stay in synchronization with the encoder, the decoder has to know the exact value of the QP [quantization parameter] used in the coded video sequence.” *Id*. at 10:33-35. Prior encoders indicated the QP value “in the encoded bit-stream at the beginning of each picture” and then “also indicated [the QP value] at the beginning of each slice of the frame.” *Id*. at 10:44-62.

85. Prior to the ’148 Patent, one significant problem was that transmitting the QP value increased the number of bits needed to encode the image. *Id*. at 10:35-37. More specifically, in prior systems, “1.2 kbps is spent for the QP information alone.” *Id*. at 10:40-43. Thus, prior systems were “very costly in terms of the number of bits required to represent the quantization parameter information.” *Id*. at 10:62-67. Additionally, since prior systems allowed the value of QP to vary at the macroblock level, QP information in the bit-stream represented “a significant proportion of the overall available bandwidth.” *Id*. at 11:3-17.

86. The ’148 Patent overcame these technical challenges in the prior systems by inventing a default or reference level of QP that could be applied to multiple pictures. The ’148 Patent employs the unconventional solution of using a default level of QP, which an encoder only needs to transmit once at the sequence level. *Id*. at 11:25-36. By using a default level of QP, only

a statistically smaller difference value relative to the default level of QP must be transmitted for each picture and every slice, resulting in a substantial reduction in transmission bit-rate and time needed to transmit the encoded video sequence. *Id*.

87. The '148 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that results in increased efficiency and significant reduction in transmission bit-rate. *Id*. at 11:37-42 (from 1.2 kbps to 0.2 kbps, in one example).

88. Conventional technology prior to the '148 Patent was not capable of transmitting or receiving a default or reference level of QP that could be applied to multiple pictures. Conventional technology prior to the '148 Patent was also not capable of transmitting a difference between a level of quantization and the default level of quantization at the beginning of each picture or each slice.

89. The '148 Patent recognizes and solves these specific technological problems with the conventional technology at the time. The '148 Patent's ability to define a default level of quantization for use in encoding of the digital video sequence to quantize the sets of transform coefficient values and ability to provide an indication of the default level of quantization to a decoding process was a significant advancement over existing technology.

90. The novel solution of the '148 Patent, including providing an indication of a default level of QP used for a plurality of pictures, was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. Furthermore, the combination of elements, including defining a default level of quantization for use in encoding of the digital video sequence to quantize the sets of transform

coefficient values and providing an indication of the default level of quantization to a decoding process, was not well-understood, routine, or conventional.

91. Nokia complied with any applicable marking requirements under 35 U.S.C. § 287 as to the ’148 Patent at least because the asserted claims of the ’148 Patent are all method claims that do not require marking and/or there is nothing to mark.

92. Nokia previously asserted the ’148 Patent in *Nokia Technologies Oy v. Warner Bros. Entertainment Inc. et al.*, No. 1:25-cv-01337 (D. Del., Nov. 1, 2025); *Nokia Technologies Oy v. Paramount Skydance Corporation et al.*, No. 1:25-cv-01054 (D. Del., Aug. 21, 2025); and *Nokia Technologies Oy v. Amazon.com, Inc. et al.*, No. 1:23-cv-01236 (D. Del., Oct. 31, 2023).

**D. U.S. Patent No. 8,050,321**

93. Nokia owns by assignment the entire right, title, and interest in and to U.S. Patent No. 8,050,321 (the "’321 Patent"). The ’321 Patent, entitled "Grouping of Image Frames in Video Coding," issued on November 1, 2011, to inventor Miska Hannuksela. The ’321 Patent issued from U.S. Patent Application No. 11/338,934, filed on January 25, 2006, which is a continuation of U.S. Patent Application No. 10/306,942, which claims priority to Foreign Application FI20020127, filed on January 23, 2002. A true and correct copy of the ’321 Patent is attached as Exhibit 5 and is incorporated by reference herein.

94. The ’321 Patent is not directed to an abstract idea or any patent-ineligible concept. Instead, the ’321 Patent is directed to novel and unconventional improvements to the process of video coding. The ’321 Patent provides improvements over prior video coding techniques that result in substantial benefits to video compression, video quality, and video playback.

95. Digital video files are composed of still image frames, which are displayed rapidly in succession to create an impression of a moving image. ’321 Patent at 1:55-58. The image frames typically comprise a number of stationary background objects and few moving objects, such that

the information in consecutively displayed image frames is typically largely similar. *Id*. at 1:58-65. Many video coding methods make use of this so-called “temporal redundancy” by using “motion-compensated temporal prediction,” in which the contents of an image frame are predicted from other frames. *Id*. at 2:16-23. Frames that use motion-compensated temporal prediction are also called INTER-frames. *Id*. at 2:27-29. Frames that do not use motion-compensated temporal prediction are called INTRA-frames or I-frames. *Id*. at 2:23-26.

96. Both INTER-frames and INTRA-frames may be used in the motion-compensated prediction of another frame. However, if a frame that is used in the motion-compensated prediction of another frame is lost or corrupted, the frames dependent on it can no longer be correctly decoded. *Id*. at 2:32-33.

97. For example, prior to the ’321 Patent, one significant problem occurred when a user wanted to stream or browse a video from somewhere other than the beginning of the video (e.g., the user wishes to start from a certain position such as the middle or where the user left off from a previous viewing). *Id*. at 3:62-4:4, 11:11-21. When streaming or browsing a video file from a point other than the beginning, the decoder would interpret starting in the middle of a video stream as an unintentional loss of image frames and unnecessarily try to reconstruct the image frames suspected as lost. *Id*. at 11:20-25.

98. The ’321 Patent overcame these technical challenges in the prior systems by inventing a novel independent sequence of image frames that includes an indication of a first picture in an independently decodable group of pictures. *Id*. at 4:16-35. The ’321 Patent employs the unconventional solution of encoding into a video sequence an indication of at least one image frame, which is the first image frame, in decoding order, of an independent sequence. *Id.* at 22:63-

65. This allows the encoder to ensure resiliency in the bitstream in the case that data is lost in transmission, or the decoder begins decoding in the middle of a video. *Id*. at 4:16-38.

99. The ’321 Patent therefore provides a specific technological improvement to the functionality and capabilities of video encoding technology that results in increased resiliency and improved video playback. For example, the encoder can now enable the decoder to begin decoding from a random point in a video stream without any prediction from any prior picture and without storing any pictures decoded prior to the first picture of the independent sequence in its memory. *Id*. at 4:48-58. For another example, the indication by an encoder of a first picture in an independently decodable group of pictures enables the decoder to identify a loss of a picture that is likely to cause unsatisfactory image quality and therefore require retransmission or picture refresh. *Id*. at 4:64-5:5.

100. Conventional technology prior to the ’321 Patent was not capable of identifying the first image frame of an independent sequence, wherein all motion-compensated temporal prediction references of the independent sequence refer only to image frames within the independent sequence, and resetting the identifier values for indicated first image frames of independent sequences.

101. The ’321 Patent recognizes and solves these specific technological problems that plagued conventional technology at the time. The ’321 Patent’s ability to encode an indication of at least one image frame, which is the first image frame, in decoding order, of the independent sequence and to reset identifier value for the indicated first image frame of the independent sequence was a significant advancement over existing technology.

102. The novel solution of the ’321 Patent, which includes encoding into the video sequence an indication of at least one image frame, which is the first image frame, in decoding

order, of the independent sequence and resetting the identifier value for the indicated first image frame of the independent sequence, was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. Furthermore, the combination of elements, including encoding into the video sequence an indication of at least one image frame, which is the first image frame, in decoding order, of the independent sequence and resetting the identifier value for the indicated first image frame of the independent sequence, was not well-understood, routine, or conventional.

103. Nokia complied with any applicable marking requirements under 35 U.S.C. § 287 as to the ’321 Patent at least because the asserted claims of the ’321 Patent are all method claims that do not require marking and/or there is nothing to mark.

104. Nokia previously asserted the ’321 Patent in *Nokia Technologies Oy v. Warner Bros. Entertainment Inc. et al.*, No. 1:25-cv-01337 (D. Del., Nov. 1, 2025); *Nokia Technologies Oy v. Paramount Skydance Corporation et al.*, No. 1:25-cv-01054 (D. Del., Aug. 21, 2025); *Nokia Technologies Oy v. ASUSTeK Computer Inc. et al.*, No. 2:25-cv-03053 (CD Cal., Apr. 7, 2025); *Nokia Technologies Oy v. Acer Inc. et al.*, No. 1:25-cv-00523 (WD Tex., Apr. 7, 2025); *Nokia Technologies Oy v. Hisense Company Ltd. et al.*, No. 1:25-cv-01871 (ND Ga., Apr. 7, 2025); *Nokia Technologies Oy v. HP, Inc.*, No. 1:23-cv-01237 (D. Del., Oct. 31, 2023); *Nokia Technologies Oy v. Amazon.com, Inc. et al.*, No. 1:23-cv-01236 (D. Del., Oct. 31, 2023); *In the Matter of Certain Video Capable Electronic Devices, Including Computers, Streaming Devices, Televisions, and Components and Modules Thereof*, Inv. No. 337-TA-1380 (filed Oct. 31, 2023); and *In the Matter of Certain Video-Capable Laptop, Desktop Computers, Handheld Computers, Tablets, Televisions, Projectors, and Components and Modules Thereof*, Inv. No. 337-TA-1448 (filed Apr. 11, 2025).

**E. U.S. Patent No. 7,289,674**

105. Nokia owns by assignment the entire right, title, and interest in and to U.S. Patent No. 7,289,674 (the "'674 Patent"). The '674 Patent, entitled "Spatial Prediction Based Intra Coding" issued on October 30, 2007, to inventor Marta Karczewicz. The '674 Patent issued from U.S. Patent Application No. 10/459,126, filed on June 10, 2003, and claims priority, as a continuation-in-part to U.S. Patent Application No. 10/171,467, filed on June 12, 2002, and to three provisional applications, Provisional Application No. 60/395,178, filed on July 9, 2002; Provisional Application No. 60/391,112, filed on June 21, 2002; and Provisional Application No. 60/388,061, filed on June 11, 2002. A true and correct copy of the '674 Patent is attached as Exhibit 6 and incorporated by reference herein.

106. The '674 Patent is not directed to an abstract idea or any patent-ineligible concept. Instead, the '674 Patent is directed to novel and unconventional improvements to the process of video coding. The '674 Patent provides improvements over prior video coding techniques that result in substantial benefits to video compression, video quality, and video playback.

107. Prior to the '674 Patent, systems and methods (e.g., H.26L/H.264) used to code a block of video data using intra coding, a look-up table-based approach was used, in which possible spatial prediction modes for a current block (C) were ordered in accordance with their probability of occurrence given a particular combination of coding modes for previously-coded neighboring blocks above (U) and to the left of (L) the current block. In such an approach, "the memory required to keep ordering of prediction modes for block C given prediction modes of blocks U and L is demanding. In WD2 ["Working Draft 2"] of the JVT coder, because 9 modes are used for prediction, there are 9×9 possible combinations of modes for blocks U and L. For each combination, an ordering of 9 possible modes has to be specified. Assuming each number requires one byte to transmit, this means that 9×9×9 bytes are needed to specify the ordering of prediction

modes. In addition, more memory may be required to specify special cases—for example, if one or both blocks U and L are not available." *Id.* at 5:37-48.

108. The '674 Patent overcame these technical challenges in the prior systems and methods by inventing a new method for coding a digital image using intra-mode block prediction, wherein "[a] list of prediction modes for each combination of prediction modes of the neighboring blocks is obtained. The modes assigned to each combination of prediction modes may be divided into two groups. The first group includes m (where m is smaller than the overall number n of available modes) most probable prediction modes and the second group includes the remaining modes. The modes in the first group are ordered according to their probability. This order may be specified as a list of modes ordered from most probable to the least probable mode. The modes belonging to the second group may be ordered in some predetermined manner, which may be specified depending on the information already available to the decoder. Information is sent to the decoder regarding whether the mode selected for a given block belongs to the first group or to the second group. If it belongs to the first group, the information is transmitted indicating that ith most probable mode shall be used for a block C given the combination of modes for blocks U and L. If the mode belongs to the second group, the information is transmitted indicating that jth mode of this group should be used." *Id.* at 5:58-6:29. Further, the '674 Patent teaches that when only one mode belongs to the first group, "if the decoder receives the information that first group is selected, no further information is required since only one mode belongs to this group." *Id.* at 13:48-60.

109. As the '674 Patent explains, "it is possible to obtain an ordered list of prediction modes for one combination of prediction modes of neighboring blocks as a function of prediction modes for another combination." *Id.* at 6:67-7:3. With the invention of the '674 Patent, the list of

prediction modes is separated into two lists and ordered based on the probability of occurrence, allowing for more efficient indication of more probable modes. *Id.* at 13:3-17.

110. The ’674 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that results in, for example, reduced memory requirements and improved compression efficiency, which was not well-understood, routine, or conventional. *Id.* at 5:49-52; 12:60-62.

111. Nokia complied with any applicable marking requirements under 35 U.S.C. § 287 as to the ’674 Patent at least because the asserted claims of the ’674 Patent are all method claims that do not require marking and/or there is nothing to mark.

112. Nokia previously asserted the ’674 Patent in *Nokia Technologies Oy v. Warner Bros. Entertainment Inc. et al.*, No. 1:25-cv-01337 (D. Del., Nov. 1, 2025); and *Nokia Technologies Oy v. Paramount Skydance Corporation et al.*, No. 1:25-cv-01054 (D. Del., Aug. 21, 2025).

**F. U.S. Patent No. 6,968,005**

113. Nokia owns by assignment all rights, title, and interest in and to U.S. Patent No. 6,968,005 (“the ’005 Patent”). The ’005 Patent, entitled “Video Coding,” issued on November 22, 2005, to inventor Miska Hannuksela. The ’005 Patent issued from U.S. Application No. 09/855,640, filed on May 15, 2001, and claims priority to Great Britain Patent Application Number 0011597, filed on May 15, 2000. A true and correct copy of the ’005 Patent is attached hereto as Exhibit 7 and incorporated by reference herein.

114. The ’005 Patent is not directed to an abstract idea or any patent-ineligible concept. Instead, the ’005 Patent is directed to novel and unconventional improvements to error detection when using motion-compensated prediction in the field of digital video coding. The ’005 Patent provides improvements over prior motion compensated prediction and video compression

techniques that result in substantial benefits to motion prediction, video compression, video quality, and video playback.

115. A video sequence consists of a series of still pictures or frames, and "objects appearing in a previous image are also likely to appear in the current image." '005 Patent at 1:6-7, 1:14-16. For example, in a particular scene, the background may change very little, or a car may drive by, where the car itself does not change and merely moves across the screen. This type of redundancy is called "temporal redundancy." *Id*. at 1:14-16. Video "[c]ompression can be achieved by taking advantage of this temporal redundancy and predicting the current picture from another picture, termed an anchor or reference picture." *Id*. at 1:16-19.

116. As the '005 Patent explains, not all pictures use temporal redundancy. "A compressed video clip typically consists of a sequence of pictures, which can be roughly categorized into temporally independent INTRA pictures and temporally differentially coded INTER pictures." *Id*. at 1:59-1:62. That is, INTER pictures rely on a temporal reference frame and INTRA pictures do not.

117. Similarly, not all pictures are used as reference pictures, *i.e.*, other pictures are not predicted from them. *Id*. at 1:48-50. Pictures that are not used as reference pictures "can be discarded (intentionally or unintentionally) without impacting the picture quality of future pictures." *Id*. at 1:50-52. Reference pictures, on the other hand, are used to predict other pictures. Therefore, an error in a reference picture "is propagated both spatially and temporally," which means that "once an error occurs, it is easily visible to the human eye for a relatively long time." *Id*. at 2:8-13.

118. Prior to the '005 Patent, one significant problem was that "the bit-stream does not include information identifying the reference picture," such that there is "no means to detect if a

reference picture is lost." '005 Patent at 3:35-39. Therefore, there was no way to know if a picture error would propagate into future pictures and substantially degrade the quality of the video (as in the case with a reference picture) or whether the picture error could simply be ignored (as in the case with a non-reference picture). *Id*. at 3:52-55. Prior systems could not differentiate between the two scenarios and instead would freeze until the next INTRA frame was received or expend resources to perform error concealment techniques. *Id*. at 3:56-62, 2:29-2:64.

119. The '005 Patent overcame these technical challenges in the prior systems by inventing a novel sequence indicator with an independent numbering scheme to identify reference pictures and to enable the differentiation between a loss of a reference picture from a loss of a non-reference picture. *Id*. at 4:3-12, 15:2-17. The '005 Patent employs the unconventional solution of incrementing a new sequence indicator each time a reference picture is encoded so that it is possible to differentiate between errors in or loss of a reference picture versus a non-reference picture. *Id*. at 4:13-19.

120. The '005 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that results in increased efficiency and video quality because the decoder would no longer freeze and wait for an INTRA frame when a non-reference picture has an error or is lost. *Id*. at 4:23-25, 4:34-37.

121. Conventional technology prior to the '005 Patent was not capable of identifying and distinguishing the loss of a reference frame from a non-reference frame and therefore could not take appropriate action to compensate for the loss of a reference frame as compared to a non-reference frame.

122. The '005 Patent recognizes and solves these specific technological problems with the conventional technology at the time. The '005 Patent's ability to use a sequence indicator

having an independent numbering scheme, such that consecutive pictures used to form reference pictures in encoding order are assigned sequence indicator values that differ with respect to each other by a predetermined amount independent of the number of non-reference pictures encoded between successive reference pictures was a significant advancement over existing technology.

123. The novel solution of the ’005 Patent, including a sequence indicator with an independent numbering scheme to identify reference pictures, was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. Furthermore, the combination of elements, including using a sequence indicator having an independent numbering scheme, such that consecutive pictures used to form reference pictures in encoding order are assigned sequence indicator values that differ with respect to each other by a predetermined amount independent of the number of non-reference pictures encoded between successive reference pictures, was not well-understood, routine, or conventional.

124. Nokia complied with any applicable marking requirements under 35 U.S.C. § 287 as to the ’005 Patent at least because the asserted claims of the ’005 Patent are all method claims that do not require marking and/or there is nothing to mark.

125. Nokia previously asserted the ’005 Patent in *Nokia Technologies Oy v. Warner Bros. Entertainment Inc. et al.*, No. 1:25-cv-01337 (D. Del., Nov. 1, 2025); *Nokia Technologies Oy v. Paramount Skydance Corporation et al.*, No. 1:25-cv-01054 (D. Del., Aug. 21, 2025); *Nokia Technologies Oy v. Amazon.com, Inc. et al.*, No. 1:23-cv-01236 (D. Del., Oct. 31, 2025); *Nokia Technologies Oy v. Lenovo (Shanghai) Electronics Technology Co. Ltd.*, No. 5:19-cv-00427 (ED N. Car., Sep. 25, 2019); and *Nokia Technologies Oy v. Apple Inc.*, No. 2:16-cv-01440 (ED Tex., Dec. 21, 2016).

**G. U.S. Patent No. 8,107,744**

126. Nokia owns by assignment the entire right, title, and interest in and to U.S. Patent No. 8,107,744 (the "'744 Patent"). The '744 Patent, entitled "Picture Buffering for Prediction References and Display," issued on January 31, 2012, to inventors Dong Tian, Miska Hannuksela, and Ye-Kui Wang. The '744 Patent issued from U.S. Application No. 10/703,109, filed on November 6, 2003, which claims priority to U.S. Provisional Application Numbers 60/424,409, filed on November 6, 2002, 60/429,953, filed on November 29, 2002, and 60/430,712, filed on December 3, 2002. A true and correct copy of the '744 Patent is attached as Exhibit 8 and is incorporated by reference herein.

127. The '744 Patent is not directed to an abstract idea or any patent-ineligible concept. Instead, the '744 Patent is directed to novel and unconventional improvements to picture buffering for prediction references and pictures for display in digital video coding. The '744 Patent provides improvements over prior picture buffering techniques that result in substantial benefits to video compression, error resiliency, and memory savings.

128. As described by the '744 Patent, when using "conventional video coding standards, the decoding order of pictures is the same as the display order except for B pictures," which "can be bi-directionally temporally predicted from two reference pictures, where one reference picture is temporally preceding and the other reference picture is temporally succeeding in display order." '744 Patent at 1:58-64. However, generally speaking, "[o]nly the latest reference picture in decoding order can succeed the B picture in display order" and "[a] conventional B picture cannot be used as a reference picture for temporal prediction," which means "a conventional B picture can be disposed of without affecting the decoding of any other pictures." *Id.* at 1:64-2:4.

129. The '744 Patent explains that the "optional reference picture selection mode of H.263" enabled "selection of the reference frame for motion compensation per each picture

segment, e.g., per each slice in H.263," and "the optional Enhanced Reference Picture Selection Mode of H.263 … enable[d] selection of the reference frame for each macroblock separately." *Id.* at 1:39-45. The '744 Patent further explains that, in conventional technology, "the decoding order of pictures is the same as the display order except for B pictures. A block in a conventional B picture can be bi-directionally temporally predicted from two reference pictures, where one reference picture is temporally preceding and the other reference picture is temporally succeeding in display order." *Id*. at 1:58-64.

130. Standardization efforts by the Joint Video Team (JVT) of ITU-T and ISO/IEC related to the H.264 Standard for decoding involved efforts to decouple display order from the decoding order of pictures and permit reference pictures to be bi-predictive such that "[r]eference pictures for a block in a B picture can either be before or after the B picture in display order." These changes allowed any picture to be a reference or non-reference picture where "[p]ictures that are not used as reference pictures are marked explicitly" and allowed pictures to "contain slices that are coded with a different coding type." *Id.* at 1:30-31, 2:5-22. As noted by the '744 Patent, "[d]ecoupling of display order from decoding order can be beneficial from compression efficiency and error resiliency point of view." *Id.* at 2:23-25; *see also id.* at 2:26-40 (discussing "[a]n example of a prediction structure potentially improving compression efficiency"), 2:41-61 (discussing "an example of the intra picture postponement method that can be used to improve error resiliency").

131. These efforts to permit flexibility in decode order and use of different pictures as reference pictures created issues with buffering. *Id.* at 3:1-23. As the '744 Patent explains, "[i]n the JVT coding standard, decoded pictures have to be buffered for two reasons: First, decoded pictures are used as reference pictures for predicting subsequent coded pictures. Second, due to

decoupling of the decoding order from the display order, decoded pictures have to be reordered in display order." *Id.* at 2:62-67. This was because, "in conventional video coding standards," "the display order for all reference pictures is the same as their decoding order and because only the latest decoded reference picture has to be buffered to reorder pictures in display order if B pictures are in use." *Id.* at 3:24-28. Because of this, "[t]he conventional video coding standard supporting reference picture selection have a reference picture buffer but they do not have a picture buffer for display reordering." *Id.* at 3:28-31. Thus, a proposal was made to the JVT to have separate buffers for display reordering and reference pictures. *Id.* at 3:32-36.

132. Prior to the '744 Patent, this JVT solution of two buffers presented the problem of needing more buffer space than was necessary while also storing the same pictures in multiple locations. *Id.* at 3:66-4:3. As the '744 Patent explains, "[t]he invention solves the decoded picture buffering problem in the JVT coding standard that did not exist in conventional video coding standards." *Id.* at 6:63-65.

133. The '744 Patent overcame the shortcomings of the JVT's prior solution by inventing a solution "wherein the same buffer can be used to store at the decoder both the reference pictures and the pictures waiting to be displayed" whereby "the pictures are not stored twice in the memory." *Id.* at 4:4-10. The '744 Patent employs the unconventional solution of, for instance, "provid[ing] a signal containing an encoded picture stream, the pictures being defined as reference pictures or non-reference pictures, and information relating to decoding order and output order of a picture is defined for pictures of the picture stream," including where "the signal contains an indication of such a number of pictures arranged to be buffered in decoding order that is sufficient to recover the output order of pictures." *Id.* 4:56-64. As the '744 Patent explains, its "invention saves memory compared to the other solution proposed for the JVT coding standard," and "[t]he

advantage that the memory needed for buffering the pictures can be minimized is a significant advantage in small devices like mobile terminals." *Id.* at 6:65-7:2.

134. The '744 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that results in better video compression, error resiliency, and memory savings. *Id*. at 2:23-61, 6:65-7:2.

135. Conventional technology prior to the '744 Patent was not capable of using a single unified buffer to handle reference pictures and pictures decoupled from their display order.

136. The '744 Patent recognizes and solves these specific technological problems with the conventional technology at the time. The '744 Patent's ability to use a single unified buffer to handle reference pictures and pictures whose display order is decoupled from their encoding order was a significant advancement over existing technology.

137. The novel solution of the '744 Patent, including its use of a unified buffer, was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. Furthermore, the combination of elements, including use of a unified buffer in the manner claimed, was not well-understood, routine, or conventional.

138. Nokia complied with any applicable marking requirements under 35 U.S.C. § 287 as to the '744 Patent at least because the asserted claims of the '744 Patent are all method claims that do not require marking and/or there is nothing to mark.

139. Nokia previously asserted the '744 Patent in *Nokia Technologies Oy v. Warner Bros. Entertainment Inc. et al.*, No. 1:25-cv-01337 (D. Del., Nov. 1, 2025); and *Nokia Technologies Oy v. Paramount Skydance Corporation et al.*, No. 1:25-cv-01054 (D. Del., Aug. 21, 2025).

**COUNT I: PATENT INFRINGEMENT OF THE ’808 PATENT**

140. Nokia incorporates by reference the preceding paragraphs as though fully set forth herein.

141. Upon information and belief, Aylo had knowledge and notice of the ’808 Patent as the result of publicized enforcement efforts by Nokia against video companies such as Warner Bros. Entertainment Inc.; Paramount Skydance Corp.; ASUSTeK Computer Inc.; Acer Inc.; Hisense Company Ltd.; Lenovo Group Limited; HP Inc.; and Amazon.com, Inc. Upon information and belief, Aylo was at least willfully blind to the ’808 Patent due to Nokia’s publicized enforcement efforts. In any case, Aylo had knowledge and notice of the ’808 Patent at least no later than the filing date of this Original Complaint.

142. Aylo encodes and has encoded videos into H.264-compliant formats using skip coding mode.

143. Aylo infringes the ’808 Patent by making, using, selling, offering for sale, and/or importing into the United States methods covered by one or more claims of the ’808 Patent.

144. Aylo makes, uses, sells, offers for sale, and/or imports the Accused Services in this District and elsewhere in the United States, and thus directly infringes the ’808 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271.

145. Additionally, on information and belief, Aylo instructs and encourages persons and entities, for example including content partners who upload content to the Accused Services, to encode video into H.264-compliant formats:[17]

[17] https://help.pornhub.com/hc/en-us/articles/4419870696083-How-To-Upload-Videos

**Video Specs**

**Basic Video Specs**

- Accepted File Formats: AVI, WMV, MP4, MPG or MOV
- Minimum File Size: 11MB
- Maximum File Size: 10GB
- Optimal Frame Rate: 30-60 FPS
- Bitrate: Min 1500 kb/s Recommended 8000 kb/s
- Aspect Ratio: 16:9 Widescreen
- Video Resolution: Recommended 1920 x 1080
- For video codecs it is preferable to use H264 or H265 for uploads

146. For example, Aylo further instructs and encourages advertisers to encode video into H.264-compliant formats:[18]

**Ad Specifications**

| Element | Dimensions | Format | Size (max.) |
|---|---|---|---|
| Underplayer† | 770 x 76 px | JPG, PNG | 300KB |
| Channel A | 315 x 300 px | JPG, PNG, GIF | 300KB |
| Channel B | 315 x 300 px | JPG, PNG, GIF | 300KB |
| Channel A Video Ad* | 314 x 300 px | MP4 (H.264) Video | 1MB |
| | 315 x 300 px | Transparent PNG Logo Image. Place your logo and any other items you wish to appear on top of the video on this transparent image. Beware of positioning. | 300KB |
| Channel B Video Ad* | | | |
| Mobile Underplayer† | 305 x 99 px | JPG, PNG, GIF | 300KB |
| Logo Avater | 200 x 200 px | JPG, PNG | 300KB |
| Cover Photo | 1323 x 270 px | JPG, PNG | 300KB |
| Mobile Channel | 305 x 99 px | JPG, PNG, GIF | 300KB |
| Video Watermark | | YourSiteName.com/Pornhub | |
| Mobile Text Link | | | 30 Characters |
| Desktop Text Link | | | 50 Characters |
| Channel Description | | | 500 Characters |

*These items are optional. †Must be branded.

[18] Ex. 16 (redacted to censor explicit content) (accessible at https://www.pornhub.com/content_partner_guide.pdf, which includes explicit content).

147. Therefore, Aylo knowingly and intentionally induces persons and entities connected to the Accused Services, including for example content partners and advertisers, to directly infringe one or more claims of the ’808 Patent by encouraging, instructing, and aiding one or more persons or entities in the United States, including for example content partners and advertisers, to encode video as claimed in the ’808 Patent.

148. Upon information and belief, Aylo derived and derives revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the ’808 Patent in the Accused Services.

149. Aylo’s infringement of the ’808 Patent has damaged and will continue to damage Nokia.

150. A claim chart that applies claim 1 of the ’808 Patent to the Accused Services is attached as Exhibit 9.

**COUNT II: PATENT INFRINGEMENT OF THE ’469 PATENT**

151. Nokia incorporates by reference the preceding paragraphs as though fully set forth herein.

152. Upon information and belief, Aylo had knowledge and notice of the ’469 Patent as the result of publicized enforcement efforts by Nokia against video companies such as Lenovo Group Limited. Upon information and belief, Aylo was at least willfully blind to the ’469 Patent due to Nokia’s publicized enforcement efforts. In any event, Aylo had knowledge and notice of the ’469 Patent at least no later than the filing date of this Original Complaint.

153. Aylo encodes and has encoded videos into H.264-compliant formats using sub-pixel motion vectors.

154. Aylo infringes the ’469 Patent by making, using, selling, offering for sale, and/or importing into the United States methods covered by one or more claims of the ’469 Patent.

155. Aylo makes, uses, sells, offers for sale, and/or imports the Accused Services in this District and elsewhere in the United States, and thus directly infringes the ’469 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271.

156. Additionally, on information and belief, Aylo instructs and encourages persons and entities, for example including content partners who upload content to the Accused Services, to encode video into H.264-compliant formats:[19]

**Video Specs**

**Basic Video Specs**

- Accepted File Formats: AVI, WMV, MP4, MPG or MOV
- Minimum File Size: 11MB
- Maximum File Size: 10GB
- Optimal Frame Rate: 30-60 FPS
- Bitrate: Min 1500 kb/s Recommended 8000 kb/s
- Aspect Ratio: 16:9 Widescreen
- Video Resolution: Recommended 1920 x 1080
- For video codecs it is preferable to use H264 or H265 for uploads

157. For example, Aylo further instructs and encourages advertisers to encode video into H.264-compliant formats:[20]

[19] https://help.pornhub.com/hc/en-us/articles/4419870696083-How-To-Upload-Videos

[20] Ex. 16 (redacted to censor explicit content) (accessible at https://www.pornhub.com/content_partner_guide.pdf, which includes explicit content).

**Ad Specifications**

| Element | Dimensions | Format | Size (max.) |
|---|---|---|---|
| Underplayer† | 770 x 76 px | JPG, PNG | 300KB |
| Channel A | 315 x 300 px | JPG, PNG, GIF | 300KB |
| Channel B | 315 x 300 px | JPG, PNG, GIF | 300KB |
| Channel A Video Ad* | 314 x 300 px | MP4 (H.264) Video | 1MB |
| | 315 x 300 px | Transparent PNG Logo Image. Place your logo and any other items you wish to appear on top of the video on this transparent image. Beware of positioning. | 300KB |
| Channel B Video Ad* | | | |
| Mobile Underplayer† | 305 x 99 px | JPG, PNG, GIF | 300KB |
| Logo Avater | 200 x 200 px | JPG, PNG | 300KB |
| Cover Photo | 1323 x 270 px | JPG, PNG | 300KB |
| Mobile Channel | 305 x 99 px | JPG, PNG, GIF | 300KB |
| Video Watermark | | YourSiteName.com/Pornhub | |
| Mobile Text Link | | | 30 Characters |
| Desktop Text Link | | | 50 Characters |
| Channel Description | | | 500 Characters |

*These items are optional. †Must be branded.

158. Therefore, Aylo knowingly and intentionally induces persons and entities connected to the Accused Services, including for example content partners and advertisers, to directly infringe one or more claims of the ’469 Patent by encouraging, instructing, and aiding one or more persons or entities in the United States, including for example content partners and advertisers, to encode video as claimed in the ’469 Patent.

159. Upon information and belief, Aylo derived and derives revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the ’469 Patent in the Accused Services.

160. Aylo’s infringement of the ’469 Patent has damaged and will continue to damage Nokia.

161. A claim chart that applies claim 1 of the ’469 Patent to the Accused Services is attached as Exhibit 10.

**COUNT III: PATENT INFRINGEMENT OF THE ’148 PATENT**

162. Nokia incorporates by reference the preceding paragraphs as though fully set forth herein.

163. Upon information and belief, Aylo had knowledge and notice of the ’148 Patent as the result of publicized enforcement efforts by Nokia against video companies such as Warner Bros. Entertainment Inc.; Paramount Skydance Corporation; and Amazon.com, Inc. Upon information and belief, Aylo was at least willfully blind to the ’148 Patent due to Nokia’s publicized enforcement efforts. In any event, Aylo had knowledge and notice of the ’148 Patent at least no later than the filing date of this Original Complaint.

164. Aylo encodes and has encoded videos into H.264-compliant formats using quantization parameters.

165. Aylo infringes the ’148 Patent by making, using, selling, offering for sale, and/or importing into the United States methods covered by one or more claims of the ’148 Patent.

166. Aylo makes, uses, sells, offers for sale, and/or imports the Accused Services in this District and elsewhere in the United States, and thus directly infringes the ’148 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271.

167. Additionally, on information and belief, Aylo instructs and encourages persons and entities, for example including content partners who upload content to the Accused Services, to encode video into H.264-compliant formats:[21]

[21] https://help.pornhub.com/hc/en-us/articles/4419870696083-How-To-Upload-Videos

**Video Specs**

**Basic Video Specs**

- Accepted File Formats: AVI, WMV, MP4, MPG or MOV
- Minimum File Size: 11MB
- Maximum File Size: 10GB
- Optimal Frame Rate: 30-60 FPS
- Bitrate: Min 1500 kb/s Recommended 8000 kb/s
- Aspect Ratio: 16:9 Widescreen
- Video Resolution: Recommended 1920 x 1080
- For video codecs it is preferable to use H264 or H265 for uploads

168. For example, Aylo further instructs and encourages advertisers to encode video into H.264-compliant formats:[22]

**Ad Specifications**

| Element | Dimensions | Format | Size (max.) |
|---|---|---|---|
| Underplayer† | 770 x 76 px | JPG, PNG | 300KB |
| Channel A | 315 x 300 px | JPG, PNG, GIF | 300KB |
| Channel B | 315 x 300 px | JPG, PNG, GIF | 300KB |
| Channel A Video Ad* | 314 x 300 px | MP4 (H.264) Video | 1MB |
| | 315 x 300 px | Transparent PNG Logo Image. Place your logo and any other items you wish to appear on top of the video on this transparent image. Beware of positioning. | 300KB |
| Channel B Video Ad* | | | |
| Mobile Underplayer† | 305 x 99 px | JPG, PNG, GIF | 300KB |
| Logo Avater | 200 x 200 px | JPG, PNG | 300KB |
| Cover Photo | 1323 x 270 px | JPG, PNG | 300KB |
| Mobile Channel | 305 x 99 px | JPG, PNG, GIF | 300KB |
| Video Watermark | | YourSiteName.com/Pornhub | |
| Mobile Text Link | | | 30 Characters |
| Desktop Text Link | | | 50 Characters |
| Channel Description | | | 500 Characters |

*These items are optional. †Must be branded.

[22] Ex. 16 (redacted to censor explicit content) (accessible at https://www.pornhub.com/content_partner_guide.pdf, which includes explicit content).

169. Therefore, Aylo knowingly and intentionally induces persons and entities connected to the Accused Services, including for example content partners and advertisers, to directly infringe one or more claims of the ’148 Patent by encouraging, instructing, and aiding one or more persons or entities in the United States, including for example content partners and advertisers, to encode video as claimed in the ’148 Patent.

170. Upon information and belief, Aylo derived and derives revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the ’148 Patent in the Accused Services.

171. Aylo’s infringement of the ’148 Patent has damaged and will continue to damage Nokia.

172. A claim chart that applies claim 1 of the ’148 Patent to the Accused Services is attached as Exhibit 11.

## COUNT IV: PATENT INFRINGEMENT OF THE ’321 PATENT

173. Nokia incorporates by reference the preceding paragraphs as though fully set forth herein.

174. Upon information and belief, Aylo had knowledge and notice of the ’321 Patent as the result of publicized enforcement efforts by Nokia against video companies such as Warner Bros. Entertainment Inc.; Paramount Skydance Corporation; ASUSTeK Computer Inc.; Acer Inc.; Hisense Company Ltd.; HP, Inc.; and Amazon.com, Inc. Upon information and belief, Aylo was at least willfully blind to the ’321 Patent due to Nokia’s publicized enforcement efforts. In any event, Aylo had knowledge and notice of the ’321 Patent at least no later than the filing date of this Original Complaint.

175. Aylo encodes and has encoded videos into H.264-compliant formats using instantaneous decoder refresh pictures.

176. Aylo infringes the ’321 Patent by making, using, selling, offering for sale, and/or importing into the United States methods covered by one or more claims of the ’321 Patent.

177. Aylo makes, uses, sells, offers for sale, and/or imports the Accused Services in this District and elsewhere in the United States, and thus directly infringes the ’321 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271.

178. Additionally, on information and belief, Aylo instructs and encourages persons and entities, for example including content partners who upload content to the Accused Services, to encode video into H.264-compliant formats:[23]

**Video Specs**

**Basic Video Specs**

- Accepted File Formats: AVI, WMV, MP4, MPG or MOV
- Minimum File Size: 11MB
- Maximum File Size: 10GB
- Optimal Frame Rate: 30-60 FPS
- Bitrate: Min 1500 kb/s Recommended 8000 kb/s
- Aspect Ratio: 16:9 Widescreen
- Video Resolution: Recommended 1920 x 1080
- For video codecs it is preferable to use H264 or H265 for uploads

179. For example, Aylo further instructs and encourages advertisers to encode video into H.264-compliant formats:[24]

[23] https://help.pornhub.com/hc/en-us/articles/4419870696083-How-To-Upload-Videos

[24] Ex. 16 (redacted to censor explicit content) (accessible at https://www.pornhub.com/content_partner_guide.pdf, which includes explicit content).

**Ad Specifications**

| Element | Dimensions | Format | Size (max.) |
|---|---|---|---|
| Underplayer† | 770 x 76 px | JPG, PNG | 300KB |
| Channel A | 315 x 300 px | JPG, PNG, GIF | 300KB |
| Channel B | 315 x 300 px | JPG, PNG, GIF | 300KB |
| Channel A Video Ad* | 314 x 300 px | MP4 (H.264) Video | 1MB |
| | 315 x 300 px | Transparent PNG Logo Image. Place your logo and any other items you wish to appear on top of the video on this transparent image. Beware of positioning. | 300KB |
| Channel B Video Ad* | | | |
| Mobile Underplayer† | 305 x 99 px | JPG, PNG, GIF | 300KB |
| Logo Avater | 200 x 200 px | JPG, PNG | 300KB |
| Cover Photo | 1323 x 270 px | JPG, PNG | 300KB |
| Mobile Channel | 305 x 99 px | JPG, PNG, GIF | 300KB |
| Video Watermark | | YourSiteName.com/Pornhub | |
| Mobile Text Link | | | 30 Characters |
| Desktop Text Link | | | 50 Characters |
| Channel Description | | | 500 Characters |

*These items are optional. †Must be branded.

180. Therefore, Aylo knowingly and intentionally induces persons and entities connected to the Accused Services, including for example content partners and advertisers, to directly infringe one or more claims of the ’321 Patent by encouraging, instructing, and aiding one or more persons or entities in the United States, including for example content partners and advertisers, to encode video as claimed in the ’321 Patent.

181. Upon information and belief, Aylo derived and derives revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the ’321 Patent in the Accused Services.

182. Aylo’s infringement of the ’321 Patent has damaged and will continue to damage Nokia.

183. A claim chart that applies claim 1 of the ’321 Patent to the Accused Services is attached as Exhibit 12.

## COUNT V: PATENT INFRINGEMENT OF THE ’674 PATENT

184. Nokia incorporates by reference the preceding paragraphs as though fully set forth herein.

185. Upon information and belief, Aylo had knowledge and notice of the ’674 Patent as the result of publicized enforcement efforts by Nokia against video companies such as Warner Bros. Entertainment Inc. and Paramount Skydance Corporation. Upon information and belief, Aylo was at least willfully blind to the ’674 Patent due to Nokia’s publicized enforcement efforts. In any event, Aylo had knowledge and notice of the ’674 Patent at least no later than the filing date of this Original Complaint.

186. Aylo encodes and has encoded videos into H.264-compliant formats using intra mode predictions.

187. Aylo infringes the ’674 Patent by making, using, selling, offering for sale, and/or importing into the United States methods covered by one or more claims of the ’674 Patent.

188. Aylo makes, uses, sells, offers for sale, and/or imports the Accused Services in this District and elsewhere in the United States, and thus directly infringes the ’674 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271.

189. Additionally, on information and belief, Aylo instructs and encourages persons and entities, for example including content partners who upload content to the Accused Services, to encode video into H.264-compliant formats:[25]

[25] https://help.pornhub.com/hc/en-us/articles/4419870696083-How-To-Upload-Videos

**Video Specs**

**Basic Video Specs**

- Accepted File Formats: AVI, WMV, MP4, MPG or MOV
- Minimum File Size: 11MB
- Maximum File Size: 10GB
- Optimal Frame Rate: 30-60 FPS
- Bitrate: Min 1500 kb/s Recommended 8000 kb/s
- Aspect Ratio: 16:9 Widescreen
- Video Resolution: Recommended 1920 x 1080
- For video codecs it is preferable to use H264 or H265 for uploads

190. For example, Aylo further instructs and encourages advertisers to encode video into H.264-compliant formats:[26]

**Ad Specifications**

| Element | Dimensions | Format | Size (max.) |
|---|---|---|---|
| Underplayer† | 770 x 76 px | JPG, PNG | 300KB |
| Channel A | 315 x 300 px | JPG, PNG, GIF | 300KB |
| Channel B | 315 x 300 px | JPG, PNG, GIF | 300KB |
| Channel A Video Ad* | 314 x 300 px | MP4 (H.264) Video | 1MB |
| | 315 x 300 px | Transparent PNG Logo Image. Place your logo and any other items you wish to appear on top of the video on this transparent image. Beware of positioning. | 300KB |
| Channel B Video Ad* | | | |
| Mobile Underplayer† | 305 x 99 px | JPG, PNG, GIF | 300KB |
| Logo Avater | 200 x 200 px | JPG, PNG | 300KB |
| Cover Photo | 1323 x 270 px | JPG, PNG | 300KB |
| Mobile Channel | 305 x 99 px | JPG, PNG, GIF | 300KB |
| Video Watermark | | YourSiteName.com/Pornhub | |
| Mobile Text Link | | | 30 Characters |
| Desktop Text Link | | | 50 Characters |
| Channel Description | | | 500 Characters |

*These items are optional. †Must be branded.

[26] Ex. 16 (redacted to censor explicit content) (accessible at https://www.pornhub.com/content_partner_guide.pdf, which includes explicit content).

191. Therefore, Aylo knowingly and intentionally induces persons and entities connected to the Accused Services, including for example content partners and advertisers, to directly infringe one or more claims of the ’674 Patent by encouraging, instructing, and aiding one or more persons or entities in the United States, including for example content partners and advertisers, to encode video as claimed in the ’674 Patent.

192. Upon information and belief, Aylo derived and derives revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the ’674 Patent in the Accused Services.

193. Aylo’s infringement of the ’674 Patent has damaged and will continue to damage Nokia.

194. A claim chart that applies claim 1 of the ’674 Patent to the Accused Services is attached as Exhibit 13.

## COUNT VI: PATENT INFRINGEMENT OF THE ’005 PATENT

195. Nokia incorporates by reference the preceding paragraphs as though fully set forth herein.

196. Upon information and belief, Aylo had knowledge and notice of the ’005 Patent as the result of publicized enforcement efforts by Nokia against video companies such as Warner Bros. Entertainment Inc.; Paramount Skydance Corporation; Amazon.com, Inc.; Lenovo (Shanghai) Electronics Technology Co. Ltd.; and Apple Inc. Upon information and belief, Aylo was at least willfully blind to the ’005 Patent due to Nokia’s publicized enforcement efforts. In any event, Aylo had knowledge and notice of the ’005 Patent at least no later than the filing date of this Original Complaint.

197. Aylo encodes and has encoded videos into H.264-compliant formats using temporally independent intra pictures and temporally predicted pictures.

198. Aylo infringes the ’005 Patent by making, using, selling, offering for sale, and/or importing into the United States methods covered by one or more claims of the ’005 Patent.

199. Aylo makes, uses, sells, offers for sale, and/or imports the Accused Services in this District and elsewhere in the United States, and thus directly infringes the ’005 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271.

200. Additionally, on information and belief, Aylo instructs and encourages persons and entities, for example including content partners who upload content to the Accused Services, to encode video into H.264-compliant formats:[27]

**Video Specs**

**Basic Video Specs**

- Accepted File Formats: AVI, WMV, MP4, MPG or MOV
- Minimum File Size: 11MB
- Maximum File Size: 10GB
- Optimal Frame Rate: 30-60 FPS
- Bitrate: Min 1500 kb/s Recommended 8000 kb/s
- Aspect Ratio: 16:9 Widescreen
- Video Resolution: Recommended 1920 x 1080
- For video codecs it is preferable to use H264 or H265 for uploads

201. For example, Aylo further instructs and encourages advertisers to encode video into H.264-compliant formats:[28]

[27] https://help.pornhub.com/hc/en-us/articles/4419870696083-How-To-Upload-Videos

[28] Ex. 16 (redacted to censor explicit content) (accessible at https://www.pornhub.com/content_partner_guide.pdf, which includes explicit content).

**Ad Specifications**

| Element | Dimensions | Format | Size (max.) |
|---|---|---|---|
| Underplayer[†] | 770 x 76 px | JPG, PNG | 300KB |
| Channel A | 315 x 300 px | JPG, PNG, GIF | 300KB |
| Channel B | 315 x 300 px | JPG, PNG, GIF | 300KB |
| Channel A Video Ad* | 314 x 300 px | MP4 (H.264) Video | 1MB |
| | 315 x 300 px | Transparent PNG Logo Image. Place your logo and any other items you wish to appear on top of the video on this transparent image. Beware of positioning. | 300KB |
| Channel B Video Ad* | | | |
| Mobile Underplayer[†] | 305 x 99 px | JPG, PNG, GIF | 300KB |
| Logo Avater | 200 x 200 px | JPG, PNG | 300KB |
| Cover Photo | 1323 x 270 px | JPG, PNG | 300KB |
| Mobile Channel | 305 x 99 px | JPG, PNG, GIF | 300KB |
| Video Watermark | | YourSiteName.com/Pornhub | |
| Mobile Text Link | | | 30 Characters |
| Desktop Text Link | | | 50 Characters |
| Channel Description | | | 500 Characters |

*These items are optional. [†]Must be branded.

202. Therefore, Aylo knowingly and intentionally induces persons and entities connected to the Accused Services, including for example content partners and advertisers, to directly infringe one or more claims of the ’005 Patent by encouraging, instructing, and aiding one or more persons or entities in the United States, including for example content partners and advertisers, to encode video as claimed in the ’005 Patent.

203. Upon information and belief, Aylo derived and derives revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the ’005 Patent in the Accused Services.

204. Aylo’s infringement of the ’005 Patent has damaged and will continue to damage Nokia.

205. A claim chart that applies claim 1 of the ’005 Patent to the Accused Services is attached as Exhibit 14.

**COUNT VII: PATENT INFRINGEMENT OF THE ’744 PATENT**

206. Nokia incorporates by reference the preceding paragraphs as though fully set forth herein.

207. Upon information and belief, Aylo had knowledge and notice of the ’744 Patent as the result of publicized enforcement efforts by Nokia against video companies such as Warner Bros. Entertainment Inc. and Paramount Skydance Corporation. Upon information and belief, Aylo was at least willfully blind to the ’744 Patent due to Nokia’s publicized enforcement efforts. In any event, Aylo had knowledge and notice of the ’744 Patent at least no later than the filing date of this Original Complaint.

208. Aylo encodes and has encoded videos into H.264-compliant formats including reference and non-reference pictures.

209. Aylo infringes the ’744 Patent by making, using, selling, offering for sale, and/or importing into the United States methods covered by one or more claims of the ’744 Patent.

210. Aylo makes, uses, sells, offers for sale, and/or imports the Accused Services in this District and elsewhere in the United States, and thus directly infringes the ’744 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271.

211. Additionally, on information and belief, Aylo instructs and encourages persons and entities, for example including content partners who upload content to the Accused Services, to encode video into H.264-compliant formats:[29]

[29] https://help.pornhub.com/hc/en-us/articles/4419870696083-How-To-Upload-Videos

**Video Specs**

**Basic Video Specs**

- Accepted File Formats: AVI, WMV, MP4, MPG or MOV
- Minimum File Size: 11MB
- Maximum File Size: 10GB
- Optimal Frame Rate: 30-60 FPS
- Bitrate: Min 1500 kb/s Recommended 8000 kb/s
- Aspect Ratio: 16:9 Widescreen
- Video Resolution: Recommended 1920 x 1080
- For video codecs it is preferable to use H264 or H265 for uploads

212. For example, Aylo further instructs and encourages advertisers to encode video into H.264-compliant formats:[30]

**Ad Specifications**

| Element | Dimensions | Format | Size (max.) |
|---|---|---|---|
| Underplayer† | 770 x 76 px | JPG, PNG | 300KB |
| Channel A | 315 x 300 px | JPG, PNG, GIF | 300KB |
| Channel B | 315 x 300 px | JPG, PNG, GIF | 300KB |
| Channel A Video Ad* | 314 x 300 px | MP4 (H.264) Video | 1MB |
| | 315 x 300 px | Transparent PNG Logo Image. Place your logo and any other items you wish to appear on top of the video on this transparent image. Beware of positioning. | 300KB |
| Channel B Video Ad* | | | |
| Mobile Underplayer† | 305 x 99 px | JPG, PNG, GIF | 300KB |
| Logo Avater | 200 x 200 px | JPG, PNG | 300KB |
| Cover Photo | 1323 x 270 px | JPG, PNG | 300KB |
| Mobile Channel | 305 x 99 px | JPG, PNG, GIF | 300KB |
| Video Watermark | | YourSiteName.com/Pornhub | |
| Mobile Text Link | | | 30 Characters |
| Desktop Text Link | | | 50 Characters |
| Channel Description | | | 500 Characters |

*These items are optional. †Must be branded.

[30] Ex. 16 (redacted to censor explicit content) (accessible at https://www.pornhub.com/content_partner_guide.pdf, which includes explicit content).

213. Therefore, Aylo knowingly and intentionally induces persons and entities connected to the Accused Services, including for example content partners and advertisers, to directly infringe one or more claims of the ’744 Patent by encouraging, instructing, and aiding one or more persons or entities in the United States, including for example content partners and advertisers, to encode video as claimed in the ’744 Patent.

214. Upon information and belief, Aylo derived and derives revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the ’744 Patent in the Accused Services.

215. Aylo’s infringement of the ’744 Patent has damaged and will continue to damage Nokia.

216. A claim chart that applies claim 12 of the ’744 Patent to the Accused Services is attached as Exhibit 15.

## COUNT VIII: DECLARATORY JUDGMENT OF NO RAND COMMITMENT FOR THE ENCODING CLAIMS OF THE ASSERTED PATENTS

217. Nokia incorporates by reference the preceding paragraphs as though fully set forth herein.

218. The ITU’s Common Patent Policy deems “essential” only patent claims that are required to implement a specific Recommendation.

219. The H.264 Recommendation specifies the implementation of decoders. It does not, however, specify the implementation of encoders. The H.264 Recommendation defines “encoding process” as “[a] process, ***not specified in this Recommendation*** | International Standard, that produces a bitstream conforming to this Recommendation | International Standard.”

220. Under the ITU’s Common Patent Policy, only *de*coding patent claims “essential” to the H.264 Recommendation are encumbered by a RAND commitment.

221. Accordingly, as tribunals have recognized, patent claims covering encoding processes are not "essential" to the H.264 Standard and are thus not RAND encumbered.

222. Thus, Nokia's asserted encoding patent claims are not subject to the ITU Common Patent Policy, that Policy's RAND commitment, or any other provisions of that Policy.

223. For over a year, Nokia has made multiple, good-faith attempts to engage Aylo in licensing discussions. Aylo has failed to respond to any of Nokia's correspondence despite receiving one or more of Nokia's letters.

224. On information and belief, a dispute exists between Nokia and Aylo concerning whether Nokia's encoding patent claims are not subject to the ITU Common Patent Policy, that Policy's RAND commitment, or any other provisions of that Policy, as confirmed by the fact that Aylo refused three times to engage in licensing negotiations with Nokia. Aylo has not agreed or conceded that Nokia's encoding patent claims are not subject to the ITU Common Patent Policy, that Policy's RAND commitment, or any other provisions of that Policy. There is a case or controversy of sufficient immediacy, reality, and ripeness to warrant the issuance of a declaratory judgment.

225. Nokia seeks a declaration that Nokia's asserted encoding patent claims are not subject to the ITU Common Patent Policy, that Policy's RAND commitment, or any other provisions of that Policy.

## ATTORNEYS' FEES

226. Nokia is entitled to recover reasonable and necessary attorneys' fees and costs under applicable law.

## DEMAND FOR JURY TRIAL

227. Nokia hereby demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Nokia respectfully requests that this Court enter judgment in its favor as follows and afford Nokia the following relief:

A. adjudge and declare that Aylo directly and/or indirectly infringes method claims of the Asserted Patents;

B. adjudge and declare that Aylo's infringement of method claims of the Asserted Patents was willful and that Aylo's continued infringement is willful;

C. award Nokia its damages going back six years from the date of this Original Complaint due to Aylo's infringement and the fact that the asserted method claims do not require marking and/or there is nothing to mark;

D. award Nokia enhanced damages pursuant to 35 U.S.C. § 284;

E. award Nokia pre-judgment and post-judgment interest to the full extent allowed under the law, as well as its costs;

F. adjudge and declare that this is an exceptional case and award Nokia its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

G. order an accounting of damages for acts of infringement;

H. adjudge and declare that Nokia's asserted encoding patent claims are not subject to a RAND commitment;

I. award Nokia its costs of suit;

J. award such other relief, including equitable relief and relief that is necessary to effectuate the Court's exercise of its jurisdiction through final judgment, which may be requested and to which Nokia is entitled.

Dated: October 2, 2026

Respectfully submitted,

*/s/ Warren Lipschitz*

Warren Lipschitz (Lead Counsel)
Texas State Bar No. 24078867
wlipschitz@mckoolsmith.com
Alexander J. Chern
Texas State Bar No. 24109718
achern@mckoolsmith.com
Kyra Mouser
Texas State Bar No. 24134043
kmouser@mckoolsmith.com
Joseph Micheli
Texas State Bar No. 24107546
jmicheli@mckoolsmith.com
Sam Moore
Texas State Bar No. 24132421
smoore@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

R. Mitch Verboncoeur
Texas State Bar No. 24105732
mverboncoeur@mckoolsmith.com
**MCKOOL SMITH, P.C.**
303 Colorado Street, Suite 2100
Austin, TX 78701
Telephone: (512) 692-8700

Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@McKoolSmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street, Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Telecopier: (903) 923-9099

**COUNSEL FOR NOKIA**